Slip Op. 03 - 111

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |  |
|---|---|---|---|
| FORMER EMPLOYEES OF PITTSBURGH LOGISTICS SYSTEMS, INC., | : | | |
| | : | | |
| Plaintiff, | : | **Before: MUSGRAVE, JUDGE** | |
| | : | | |
| v. | : | Court No. 02-00387 | |
| | : | | |
| UNITED STATES SECRETARY OF LABOR | : | | |
| | : | | |
| Defendant. | : | | |

[Judgment on pleadings for plaintiffs; Secretary of Labor's negative determination on trade adjustment assistance petition reversed, DOL ordered to certify TAA benefits eligibility.]

Decided: August 28, 2003

*King & Spalding*, Washington, D.C. (*Lisa L. Cochrane*, *J. Michael Taylor, Stephen A. Jones*), for the plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, *Lucius B. Lau*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Paul D. Kovac*); *Louisa M. Reynolds*, Office of the Solicitor, U.S. Department of Labor, for the defendant.

## OPINION

This opinion concerns the results of remand from the U.S. Department of Labor, Office of Employment and Training Administration ("DOL" or "Labor") on a trade adjustment assistance petition previously denied certification. Familiarity with the circumstances of this matter is presumed. *See* Slip Op. 03-21 (Feb. 28, 2003). The remand results were filed on May 5, 2003, following two motions for extension of time by Labor, and again deny certification. *Notice of*

*Negative Determination on Reconsideration on Remand*, SPDoc 11, SR at 124.[1] The remand results

acknowledged the Opinion's request for clarification of why the work of "manag[ing] warehousing

and distribution" and "managing traffic and processing freight invoices" makes a petitioner ineligible

for certification as a "production" worker and interpreted the Opinion as concluding that Labor had

not fully articulated the issue of "control" that is part of Labor's service worker analysis. *See* Slip

Op. 03-21. Notwithstanding that, the remand results respond as follows:

> DOL's interpretation of the phrase "appropriate subdivision thereof"
> is limited to related or affiliated firms; [it] cannot be expanded to encompass
> two unaffiliated firms. This interpretation of the phrase "appropriate
> subdivision" is consistent with Section 222(a)(1) which requires DOL to
> consider whether a significant number of workers have been separated from
> "the workers' firm or appropriate subdivision of the firm." Because the Act
> clearly limits "appropriate subdivision" to just "the" workers' firm in the first
> requirement, DOL understands Congress to have intended to similarly limit
> "appropriate subdivision" in the immediately following requirements.

> This limitation is reflected in the regulations. The regulatory
> definition of "firm" states, "[a] firm, together with any predecessor or
> successor-in-interest, or together with any affiliated firm controlled or
> substantially or beneficially owned by substantially the same persons, may be
> considered a single firm." 29 C.F.R. § 90.2. This language allows the phrase
> "workers' firm" to include more than one entity, but only to the extent that
> those multiple entities are "controlled or substantially or beneficially owned
> by substantially the same persons." Section 90.2 of the regulations defines
> "appropriate subdivision" as one of three types of subdivisions, none of
> which permit the inclusion of a worker group employed by one firm to be
> included as within the "appropriate subdivision" of another, unaffiliated firm.
> The first two types of "appropriate subdivisions" are expressly limited to one
> "firm": either "an establishment in a multi-establishment firm" or "a distinct
> part or section of an establishment (whether or not the firm has more than one
> establishment) where the articles are produced." "One definition of
> establishment . . . is 'a permanent organization,' and would encompass any

---

[1] Following the convention of Slip Op. 03-21, supplementations of the administrative record are indicated by the addition of "S."

subdivision *up to* the size of the entire corporation." (Emphasis added.) *International Union, UAW v. Marshall*, 584 F.2d 390 (D.C. Cir. 1978).

The third type of "appropriate subdivision" encompasses "auxiliary facilities operated in conjunction with (whether or not physically separate from) production facilities." This broadens the term "appropriate subdivision" to include a facility that does not produce an article. However, this definition "has connotations that a subdivision can never be larger than a single 'establishment.' The definition's limited use of 'auxiliary facilities' implies that any physically separate operation may be a part of a subdivision only if it is merely auxiliary and used in conjunction with the main production unit." *Lloyd v. U.S. Dep't of Labor*, 637 F.2d 1267, 1274 (9th Cir. 1980). In *Lloyd*, the CIT [*sic*] stated that the word "auxiliary" implies that a facility will only be deemed an appropriate subdivision if it is a subsidiary part of a firm that is producing an article. In addition, the phrase "'operated in conjunction with' implies that the auxiliary facility must be run by the same firm as the production facility or facilities." *Id*.

Production Worker Analysis

When a worker group applies for assistance, the fundamental test DOL applies is whether the workers' firm or an appropriate subdivision of the workers' firm produced an import-impacted article during the relevant period. If the worker group produces such an article, then they are deemed "production workers."

Because an "appropriate subdivision" is limited to the "workers' firm" and Section 90.2 of the regulations permits the inclusion of multiple entities with the term "firm" only if they are affiliated entities, on remand DOL conducted additional investigation of the relationship between PLS and LTV. The investigation indicates that substantially the same persons do not control PLS and LTV. Supplemental Administrative Record (SAR) 43. No corporate official of one company is a board member or officer of the other (or of Quadrivius). SAR 42. Substantially the same persons do not own PLS and LTV. LTV was a publicly owned company. SAR 39. After LTV's bankruptcy, PLS continued business. AR 25. The contract between LTV and PLS indicates that they are separate corporations. SAR 108. Therefore, DOL finds that LTV and PLS are not "controlled or substantially beneficially owned by substantially the same persons." 29 C.F.R. § 90.2. They are independent business entities and as the word "firm" is defined by Section 90.2, "workers' firm" cannot mean both LTV and PLS.

DOL has considered which factors of employment exercised by a firm establish that it is "the" workers' firm. DOL has consistently determined that the critical employment factor is which firm was obligated to pay the employee during the relevant period. Because PLS was so obligated, DOL has determined that PLS is "the" workers' firm. SAR 40. Furthermore, the contract establishes that "PLS shall hire and use its own employees to provide the services described in this contract." (SAR 108) and "PLS is supplying its own employees, which is (*sic*) controls and directs for employment purposes." SAR 111. PLS "hired and fired" the relevant worker group. SAR 40. Therefore, DOL finds that the petitioners are employees of PLS and cannot be certified as an appropriate subdivision (or as part of an appropriate subdivision) of LTV.

The CIT Opinion ordered DOL "to explain to petitioners how their work was unrelated to production, not merely state that it was." This suggests that the CIT wants DOL to change the test of whether one qualifies as a production worker to whether the workers' tasks are "related" to production. Such a change would violate Section 222(a)(3) which, as stated earlier, requires actual production by the workers firm or an appropriate subdivision of the workers' firm. In addition, this change conflicts with previous CIT decisions that support DOL's determination that the test for production must involve the transformation of a thing into something "new and different." *Nagy v. Donovan*, 6 CIT 141, 145, 571 F. Supp. 1261, 1264 (1983).

DOL thoroughly investigated and could not find any evidence that any employees of PLS or Quadrivius actually produced any articles. AR 4, AR 11, AR 13, SAR 39. The workers' job descriptions indicate that from their workstations in LTV's Independence, Ohio facility, they managed transportation of items to and from LTV's production facility in Cleveland, Ohio. Because there is no evidence that the petitioners transformed anything into something "new and different," they are not eligible for certification as production workers.

Service Worker Analysis

On the issue of whether the petitioners should be certified as service workers, the petitioners argued that they should be certified because: they performed their job inside an LTV facility, they were supervised by LTV employees, and they were employees of LTV prior to their employment with PLS. (LTV's employees at the Independence, Ohio facility did not produce any articles. AR 16, SAR 37, SAR 48, SAR 50, SAR 68. They were

certified as a third type of appropriate subdivision because they provided services to LTV's Cleveland, Ohio production facility.  SAR 57.)

As stated earlier, when a worker group applies for assistance, the fundamental test called for by Section 222 of the Trade Act is whether the workers' firm or appropriate subdivision of the workers' firm produced an import-impacted article during the relevant period.  If there is no evidence that the worker group applying for certification produced an import-impacted article, it may only be certified if: (1) the workers['] separations were caused importantly by a reduced demand for their services from a parent firm, a firm otherwise related to the subject firm by ownership, or a firm related by control; (2) the reduction in the demand for their services originated at a production facility whose workers independently met the statutory criteria for certification; and (3) the reduction directly related to the product impacted by the imoprts.  *Abbott v. Donovan*, 6 CIT 92, 100-101, 570 F. Supp. 41, 49 (1983).  This "elaborated" analysis is necessary to determine whether a worker group has met the regulatory requirements of a type three appropriate subdivision: that the worker groups' facility is "auxiliary" and "operates in conjunction with a production facility."  This analysis is customarily called the "support service" analysis, but it is actually not much different than the fundamental test that DOL applies to every certification.

The first requirement ("the workers' separation were caused importantly by a reduced demand for their services from a parent firm, a firm otherwise related to the subject firm by ownership, or a firm related by control") focuses on the definition of "firm" as it is used in the fundamental test.  For multiple entities to be considered a single workers' firm, such entities must be "controlled or substantially beneficially owned by substantially the same persons."  29 CFR § 90.2.  As discussed earlier, PLS and LTV are not controlled or substantially beneficially owned by the same persons. The regulations establish that DOL cannot certify the petitioners as service workers because their firm is unaffiliated with a firm that produces or produced an import-impacted article.

Conclusion

Whether the performance of services by the petitioners is related or unrelated to production is not relevant to determining their eligibility for certification. Under Section 222 of the Act, what is relevant is whether the workers' firm or appropriate subdivision of the workers' firm produces an article.  The workers' firm in this case is PLS.  As acknowledged in the Court's Opinion, the relevant petitioners in this remand action "were

employed by Pittsburgh Logistics Systems, Inc. (PLS) and worked on-site at LTV's facilities in Independence, Ohio." Slip Op. [03-21 at] 2. PLS is a subsidiary of Quadrivius. SAR 36. Neither PLS not [*sic*] Quadrivius are affiliated with LTV. SAR 43. The evidence clearly establishes that PLS and Quadrivius do not produce, directly or through an appropriate subdivision, an import impacted article. "Once DOL concludes that the workers' employer was not a firm that produced an import-impacted article, it may conclude that the workers are not eligible for assistance without further analysis." *Stanley Smith v. U.S. Sec'y of Labor*, 20 CIT 201, 204, 967 F. Supp. 512, 515 (1996).

SPDoc 11, SR 126-131.

The plaintiffs filed comments on the remand results on May 15, 2003. On May 29, 2003, the government's attorney moved *sua sponte* for a second remand and a month to complete it upon the argument that in light of the plaintiff's comments further remand is necessary in order to "fully comply with the Court's order to address the question 'whether the petitioners were engaged in jobs that were integrated into or integral to "production" of steel at LTV facilities and that were lost due to import competition.'"[2] The plaintiffs filed a response opposing a second remand and arguing that Labor's request is a "sixth bite at the apple"[3] and inequitable because Labor never met with any of the plaintiffs or their counsel prior to filing the remand results despite offers to do so. Counsel for the plaintiffs interpret Labor's motion as a delaying tactic which should not be condoned and they argue that Labor should have responded to the plaintiffs comments in a pleading filed with the Court rather than through this instant motion. Pl.s' Resp. at 4. The plaintiffs therefore move for judgment on the existing pleadings. Labor filed a reply to this response on or about June 24, 2003, which

---

[2] Def.'s Mot. for Remand to Further Develop the Notice of Negative Determination of Reconsideration on Remand at 1.

[3] Pl.s' Resp. Objecting to Def.'s Mot. for Remand to further Develop the Notice of Negative Determination of Reconsideration on Remand ("Pl.s' Resp.") at 2.

without leave to file was returned to Labor.  On July 9, 2003, Labor filed a motion for leave to

submit the reply, which objects to the plaintiffs' characterization of Labor's motives and asserts that

the request for a second remand was

> solely for purposes of complying with this Court's decision and not for the
> purpose of delaying the case, bolstering the negative determination in light
> of plaintiffs' comments, or wasting judicial resources.  Due to the time
> constraints resulting from inter-departmental deliberations, and the fact that
> a remand motion does not require consultation with opposing counsel (*see*
> Rule 7(b)), we did not consult with the plaintiffs prior to filing.
>
> Plaintiffs' opposition offers little but unconstructive sniping at our
> genuine efforts to expedite this dispute by voluntarily seeking a second
> remand to ensure that the administrative record and decision are complete
> prior to judicial review.
>
> First, contrary to plaintiffs' accusations of purposeful delay, the
> previous 30-day extension for filing the redetermination results was due to
> the Department's inability to obtain the service contract between plaintiffs
> [*sic*[4]] and LTV Steel after requesting it informally. . . . As a result, the
> Department required additional time to complete the administrative process
> involved in obtaining and issuing a subpoena.  Had the service contract
> [between PLS and LTV] been readily accessible, a second extension would
> not have been necessary.  Nothing regarding this extension suggests that the
> Department was inappropriately delaying this litigation.
>
> Second, plaintiffs allege that "Labor refused to allow the Former
> Employees to provide input prior to the filing of the remand determination."
> Plaintiffs' Response at 7.  Plaintiffs make this allegation but fail to give any
> examples of the "input" or evidence that they proposed for submission and
> that was allegedly refused by the Department.  At no time did the Department
> ever prevent, refuse, or obstruct their claims.
>
> Finally, counsel for plaintiffs have continually asserted that they
> offered to meet with Department officials to "address any outstanding factual
> or legal questions" but were somehow rebuffed.  Plaintiffs response at 4. The
> Department declined these meetings because it already received a letter

---

[4]  The referenced agreement shows that it is between Pittsburgh Logistics Systems, Inc. and
LTV Steel Company, Inc.  *See* SCDoc 10, SR 105.

> stating plaintiffs' position and plaintiffs' counsel represented that they would not present additional evidence at the proposed meeting. *See* Supplemental Administrative Record at 1-31 (plaintiffs' letter). Moreover, meetings with counsel are not mandated by law or regulation and are certainly not utilized to reiterate evidence already presented. Therefore, nothing regarding the decision declining to meet with plaintiffs' counsel suggests bad faith on the part of the Department.
>
> Although plaintiffs may be dissatisfied with the pace of this litigation, there is no evidence in the record to substantiate any contention that the Department is somehow purposefully delaying and circumventing its duties. Simply stated, the remand determination was somewhat deficient in certain respects and we, in good faith, approached the Court asking for an opportunity to correct it ourselves. For the foregoing reasons, we respectfully request that the Court grant the [defendant's motion] and permit the Department [a month] to file its results. After filing the new determination, we propose that the Court permit plaintiffs the opportunity to comment and the defendant the opportunity to respond.

Def.'s Mot. for Leave to File Reply to Plaintiffs' Resp. Dated June 13, 2003, Ex. "A", at 2-4.

The plaintiffs response to the foregoing, filed on July 17, 2003, implies that Labor's reply

does not address their fundamental point, which is that Labor's

> actions have unjustifiably delayed this proceeding, and Labor's motion would require the additional, unexpected, and unnecessary expenditure of resources. The Former Employees have been wrongly denied benefits to which they are entitled for over eighteen months, and Labor has not demonstrated a willingness to fully investigate the facts underlying the Former Employees' entitlement to trade adjustment assistance. *See* the Plaintiffs' Response dated June 13, 2003.
>
> Even if Labor did not purposefully engage in dilatory tactics, its actions have effectively caused unwarranted delay. For example, Labor requested that it be allowed to file its new determination by June 30, 2003. Tellingly, Labor has not indicated that a new determination yet has been prepared. If the court were to grant Labor a sixth bite at the apple, it is likely to be at least several weeks before the Former Employees could review any redetermination for comment (a process already undertaken by the Former Employees with regard to the initial remand determination in accordance with the Court's remand order).

> Labor has had more than enough time to determine whether the Former Employees are eligible for trade adjustment assistance. The Court should not give Labor yet another opportunity to delay this matter only to "rewrite" (not reevaluate) its remand determination in order to address the Former Employees comments regarding the same. The Former Employees respectfully request that the Court rule on Labor's May 5, 2003 remand determination without further delay.

Pl.s' Resp. Objecting to Def.'s Mot. for Leave to File Reply to Plaintiffs' Resp. Dated June 13, 2003.

For the reasons following, the Court grants the defendant's motion for leave to file a reply, but denies the defendant's motion for a second remand. The Court concludes that further remand would be futile and orders Labor to certify the plaintiffs for trade adjustment assistance benefits on the basis of the administrative record.

### *Discussion*

Judicial review of this denial of TAA eligibility continues to be pursuant to the substantial evidence standard of 19 U.S.C. § 2395(b).

### I.

In *SKF USA Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001), the Court of Appeals for the Federal Circuit ("CAFC") observed that although "there may be remand situations that do not fall neatly into this taxonomy" an agency generally has five available options, not all of them meritorious, when one of its administrative determinations is being reviewed on appeal. The agency may: (1) choose to defend the determination on grounds articulated in the determination, (2) seek to defend the determination on grounds not previously articulated by it, (3) request remand of the determination for reconsideration due to intervening events outside its control, (4) or in the absence of intervening events request remand "without confessing error" in order to reconsider the position

taken in the determination, or (5) request remand "because it believes that its original decision was incorrect on the merits and it wishes to change the result." 254 F.3d at 1028.

Here, the relief sought pertains to further legal argument only, not intervening events or development of additional factual material for the record. Labor's reasons for its motion do not fall "neatly into this taxonomy," and while Labor's actual motives for remand may, as the government asserts, differ from their portrayal by the plaintiffs, the Court expects that its practitioners will continue to uphold the highest standards of the bar, which includes extending dignity and professional courtesies to one another as officers of the Court. Whether "a remand motion does not require consultation with opposing counsel" is beside the point and overlooks the Order of February 28, 2003. The Order allowed "such further matter as the plaintiffs may submit to [Labor] for consideration and in compliance with such deadlines as [Labor] may establish to effect the purposes of the Opinion and Order." That includes the ability to offer constructive comment, which the agency was obligated by the spirit of the Order to consider, on all legal and factual issues prior to issuing a redetermination.

The government's motion states that remand is only for the limited purpose of rewriting the negative remand determination. Therefore, assuming that grant of the motion would result in a determination that "rewrote" (*i.e.*, more fully addressed) why the petitioners were not engaged in jobs that were integrated into or integral to 'production' of steel at LTV facilities and that were lost due to import competition, the outcome of such a determination is no less a foregone conclusion. Unstated is the point that Labor has conducted analysis of the facts to its satisfaction. And, as always, it is the factual record which is controlling. In this instance, the administrative record is

adequate for a determination, and additional remand to Labor for the purpose of further reasoning on the precise question is unnecessary and would not promote the interest of efficient and speedy justice. The motion for leave to file a reply to the plaintiff's opposition to the government's motion for remand is helpful explanation and is therefore granted, but the motion for remand is denied.

Labor has not sought to submit a response to the plaintiffs comments, even out of time. Judgment will therefore be rendered on the pleadings.

## II.

19 U.S.C. § 2272(a) requires:

> (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated,
>
> (2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and
>
> (3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

Ordering certification of eligibility for trade adjustment assistance is a remedy of last resort. It is appropriate when, after one or more remands, it is clear that Labor continues to adhere to a discredited position that is at odds with the developed facts of record. *See, e.g., Former Employees of Barry Callebaut v. Herman*, 26 CIT ___, 240 F.Supp.2d 1214 (2002). The Court finds Labor's consideration of the facts developed and its treatment of the issues on remand not in accordance with the law of the case, not in accordance with the substantial evidence on the record, and results-oriented.

As prelude to its production worker analysis, Labor proceeds from the proposition that "[b]ecause an 'appropriate subdivision' is limited to the 'workers' firm' and Section 90.2 of the regulations permits the inclusion of multiple entities with the term 'firm' only if they are affiliated entities, on remand Labor conducted additional investigation of the relationship between PLS and LTV." As observed in Slip Op. 03-21, whether a defined unit is an "appropriate subdivision" depends upon its relationship to production, and the line of production cannot always be pigeonholed into a single "firm." The *product line* of the import-impacted article controls the analysis. If a division of company A is devoted exclusively to contributing subcomponent A for import-impacted article X, and a division of company B is devoted exclusively to contributing subcomponent B for article X, and the ultimate import-impacted article X is further-manufactured, assembled, and branded as the product of company C, and if as a result of importations of article X companies A and B are forced to close their A and B divisions and lay off the workers of those divisions, the fact that such subdivisions are unrelated to each other or to company C is irrelevant to a decision on entitlement to trade adjustment assistance benefits. Such a hypothetical is not unusual in the world of business these days, and nowhere in the statute does it state that "production" of the import-impacted article must be "contained" within a single "firm."

Labor's production worker analysis is inadequate and inconsistent with its own interpretation of its regulations as applied in other determinations. The relevant statutory requirement is "that increases of imports of *articles* like or directly competitive with *articles* produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation." 19 U.S.C. § 2272(a)(3). Labor has interpreted this provision in such as way as to include

"appropriate subdivisions" which contribute to the production of "articles like or directly competitive with" import-impacting "articles," and Slip Op. 03-21 specifically referred Labor to its affirmative determinations in *Stein Steel Mill Services* (the employees of which were working at an LTV facility in Cleveland) and *Computer Sciences*.[5]  As pointed out in Slip Op. 03-21, the import-impacted article "produced" by Stein Steel Mill Services, under contract with LTV, was the processing of slag and steel scrap for LTV.  Award of benefits to the former Stein Steel Mill Services employees hinged on the loss of production at LTV, because Labor made no determination that slag or steel scrap was an import-impacted article.  The *Computer Sciences* employees working were outsourced former DuPont employees who continued to perform the same job functions at three DuPont facilities after being outsourced.  Of particular note, they were certified despite the fact that there was "no corporate affiliation between Computer Sciences Corporation and DuPont."  SR 80 & 83.  In fact, Labor's determination expressly hinged on the fact that "the Computer Science Corporation contract workers were engaged in employment *related to the production* of polyester fiber at Dupont plants under an existing TAA certification."  S.R. 80 (highlighting added).  As stated in *Pemberton v. Marshall*, 639 F.2d 798 (D.C. Cir. 1981), "[t]he only relevant concern in determining whether a facility is part of

---

[5]  *See* TA-W-40,910 (Apr. 29, 2002), *Notice of Determinations Regarding Eligibility To Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance*, 67 Fed. Reg. 35142 (May 17, 2002) (Stein Steel Mill Services, Inc Employed at LTV Steel, Inc. Cleveland Ohio), and TA-W-39,535, A & B (Feb. 19, 2002); *Computer Sciences Corp., at Dupont Corp., Cooper River Plant, Charleston SC; Computer Sciences Corp., at Dupont Corp., Cape Fear Plant, Wilmington NC; Computer Sciences Corp., at Dupont Corp., Kinston Plant, Kinston NC.; Notice of Revised Determination on Reconsideration*, 67 Fed. Reg. 10767 (Mar. 8, 2002). *See also* TA-W-39743, A, B, C & D (Jan. 3, 2002) (DuPont plant certifications).  *Stein Steel Mill Services* and *Computer Sciences* have been made part of the administrative record of this matter.  SCDoc 6, SR 69; SCDoc 7, SR 78.

the appropriate subdivision is whether it also produces the articles in question." 639 F.2d at 801 (thus equating "appropriate subdivision" with the production line).

In this instance, as the government's motion for a second remand essentially admits, Labor's production worker analysis again places undue emphasis on the fact that LTV was, and PLS is, independent of the other. Labor has failed to consider and address the relationship of the PLS subdivision at LTV's Independence, Ohio facilities *to production* of the import-impacted articles, in disregard of the Order of February 28, 2003. Labor's assertion on remand that "[w]hether the performance of services by the petitioners is related or unrelated to production is not relevant to determining their eligibility for certification" is not only disingenuous in light of its own prior affirmative determinations, it also defies common sense.

Furthermore, Labor overemphasizes the fact that PLS hires and uses its own employees to provide services under the service agreement between PLS and LTV that Labor obtained from PLS on remand. Labor recites only these portions of the agreement as the relevant facts supporting a negative determination: "PLS shall hire and use its own employees to provide the services described in this contract" and "PLS is supplying its own employees, which is [*sic*] controls and directs for employment purposes[.]" The Court finds Labor's analysis of the LTV-PLS agreement unreasonable. The referenced portions of the agreement and the fact that PLS is (was) the payor of the plaintiffs' checks must be interpreted in light of the fact that the contract is part of an outsourcing arrangement whereby the payroll and benefits of the plaintiffs were to be processed by PLS. They are mere statements of the obvious implications of such an arrangement. Labor has ignored or overlooked the first recital of the agreement that "PLS shall utilize sufficient personnel to operate

the Traffic Support System of LTV and its affiliates[.]" More egregiously, Labor takes the statement

that "PLS is supplying its own employees, which is [*sic*] controls and directs for employment

purposes" out of context. The full portion of the relevant text reads as follows:

> It is specifically understood and acknowledged, that *although* PLS is
> supplying its own employees, which is [*sic*] controls and directs for
> *employment* purposes, *PLS shall act at all times as the Agent of LTV in
> providing all services under this contract . . . .*

SCDoc 10, SR 108 (emphasis added).

It is elementary that the principal's right of control over its agent is what defines a principal-

agent relationship, and as already determined by the Court, it is the relationship between LTV and

the PLS subdivision that matters for purposes of determining this TAA petition.[6] Previously, in the

context of the "service worker" test, Labor had argued that it interpreted "control" only to mean

ownership and corporate voting control. The Court found such argument at odds with other

---

[6] It is also worth noting that while PLS "controls and directs" its workers for *employment* purposes, the TAA statute uses no such term, nor such terms as "employer" or "employee." Workers are the backbone of *any* firm, and Congress specifically chose the words *workers' firm*, thereby elevating the worker to a more deserving level and intentionally focusing the inquiry where it belongs: upon the affected workers. Such terms were deliberately chosen to provide flexibility in interpretation, as circumstances require. In that regard, it is perhaps further worth noting that *Woodrum v. Donovan*, 5 CIT 191, 564 F. Supp. 826 (1993) stated that the "predicate" for certifying a petition "is a finding that petitioning workers *were employed by* a 'firm' which produced, or had an 'appropriate subdivision' which produced, the import-impacted article." 5 CIT at 199, 564 F.Supp. at 833 (highlighting added). As used in *Woodrum*, the term "employment" was intended to connote the workers' services to their firm, not their "legal" relationship to it. *See* 19 U.S.C. § 2272(a). Likewise, in the portion of *Stanley Smith* quoted by Labor *supra*, it might have been more accurate to use the statutory term "workers' firm" rather than "workers' employer" in the opinion, since the connotations are different, but whatever Labor's intent behind the quoted portion of *Stanley Smith* in the remand results, this Court already made it clear that it restricts that case to its specific facts. As pointed out in Slip Op. 03-21, the *Stanley Smith* court expressly stated that it did not have before it an allegation of *control* , unlike the matter at bar. *See Stanley Smith*, *supra*, 20 CIT at 205, 967 F.Supp. at 515, n.10.

affirmative TAA benefits decisions and unduly restrictive in light of the remedial purpose of the statute. The Court made clear that Labor was to determine who "exercised actual control" over and who "managed and directed" the plaintiffs for purposes of determining "control," which is a separate consideration from "ownership." Once again, Labor's analysis, contrary to Slip Op. 03-21, has entirely ignored consideration of the implications of the principal-agent relationship between LTV and PLS and also the appropriate unit of consideration, the PLS subdivision. Such reasoning has a tendency to make Labor's negative determination appear predetermined. In the final analysis of whether the PLS subdivision employees qualified for TAA benefits as production workers, Labor asserts that it

> thoroughly investigated and could not find any evidence that any employees of PLS or Quadrivius actually produced any articles. AR 4, AR 11, AR 13, SAR 39. The workers' job descriptions indicate that from their workstations in LTV's Independence, Ohio facility, they managed transportation of items to and from LTV's production facility in Cleveland, Ohio. Because there is no evidence that the petitioners transformed anything into something "new and different," they are not eligible for certification as production workers.

SPDoc 11, SR 129. The Court finds that Labor has not "thoroughly" investigated. Labor never answers the question posed to it of "whether the petitioners were engaged in jobs that were integrated into or integral to 'production' of steel at LTV facilities and that were lost due to import competition." Slip Op. 03-21 at 25; *see id*. at 12 & 21. In contravention of the Opinion, Labor continues to focus upon the corporate separateness between PLS and LTV. In doing so, it ignores or overlooks *Stein Steel Mill Services*, *Computer Sciences*, and the implications of the fact that when

it certified LTV's Technology Center in Independence,[7] it also determined that those workers were part of an "integrated production process of producing steel at LTV." SCDoc 51.

If Labor's analytical argument implies that its practice is to analyze discrete worker groups along the affected production line for eligibility, the certification of workers at affected facilities as a whole, such as those at the LTV Independence Technology Center, belies that assumption. Furthermore, Labor's assertion that LTV's Independence, Ohio facilities were actually certified as a type three "auxiliary facility" under its service worker analysis is also contradicted by the record, which states that LTV's Independence, Ohio facilities were engaged in work *related to* the production of steel and that production at the facility decreased during the time of the investigation. *See* SCDoc 5, SR 48 ("The [LTV workers in Independence] were engaged in development work related to the production of hot and cold rolled sheet steel."). Labor certified the LTV facility in Independence as a whole as an appropriate subdivision, and thereby all of the LTV employees at the facility became eligible for TAA benefits, including administrative, clerical, and maintenance workers. Labor fails to explain the distinction of why these LTV employees were "engaged" in work "related to the production of hot and cold-rolled flat steel," *cf.* CDoc 51 (the workers at the Independence Technology Center "were part of an integrated process of producing steel at LTV"), yet the plaintiffs, who were more directly related to the production of steel because they controlled the transportation of key raw materials and finished products, are to be separately situated. The only distinction is that they were "employed" by a different entity, which distinction is meaningless because the record demonstrates that the work of the facility, to which the plaintiffs were staffed and

---

[7] *See* TA-W-40,724 (Mar. 21, 2002), SCDoc 5, SR 49

tasked, qualified as "production," and, as discussed more fully below, the work of the plaintiffs was controlled by the owner of the facility.

Labor does not dispute the plaintiffs' assertion that if LTV was (or rather had continued to be) the direct payor of the plaintiffs' paychecks, the plaintiffs would have been certified along with the rest of the LTV Independence workers. Likewise, Labor does not address the assertion that LTV in fact advised PLS on salary matters regarding the employees of the PLS subdivision in Ohio. It is undisputed that the plaintiffs' jobs were permanent. It was appropriate for Labor to consider such matters, including its analysis of the workers of the PLS subdivision at the Independence Technology Center, and explain the reasons for the different outcome on the plaintiffs' petition. *See, e.g., Sec'y of Agriculture of U.S. v. United States*, 347 U.S. 645, 653 (1954). The Court therefore concludes that Labor has conducted an inadequate investigation and analysis of the plaintiffs as "production" workers.

Similarly, the Court finds Labor's service worker inadequate. The service worker analysis examines whether (1) the workers' separations were caused importantly by a reduced demand for their services from a parent firm, a firm otherwise related to the subject firm by ownership, or a firm related by control; (2) the reduction in the demand for their services originated at a production facility whose workers independently met the statutory criteria for certification; and (3) the reduction directly related to the product impacted by the imports. *See Abbott v. Donovan*, 6 CIT 92, 100-101, 570 F. Supp. 41, 49 (1983). Labor denied certification under this analysis because "PLS and LTV are not controlled or substantially beneficially owned by substantially the same persons." SPDoc 111, SR 130. This analysis was in contravention of Slip Op. 03-21.

Ironically, Labor calls attention to the observation in *Lloyd* that "'operated in conjunction with' implies that the auxiliary facility must be run by the same firm as the production facility or facilities[,]"[8] but it completely misses the obvious: that the evidence of record shows that the PLS subdivision was operationally "run by the same firm as the production facility" (LTV) in this case, as discussed more fully below. As mentioned in Slip Op. 03-21, whether considered as a "production" or a "service" worker, *all* workers perform *services* on behalf of their "firm," and the fact that a firm's output (or contribution to production) is subject to another's control over the final or further-finished product is a relevant consideration in the determination of eligibility, as Labor recognizes. *Cf. Communications Workers of America, AFL-CIO v. U.S. Sec'y of Labor*, 19 C.I.T. 687 (1995) (negative determination relying upon finding that workers produced intermediate pharmaceuticals, a different product from that for which they had been previously certified, which intermediate products were integrated into upstream production of steroids at facility not under

_____

[8] Labor quotes from *Lloyd* to bolster its implied position that production must be "embodied" within a single firm by elsewhere asserting that "the CIT [*sic*] stated that the word 'auxiliary' implies that a facility will only be deemed an appropriate subdivision if it is a subsidiary part of a firm that is producing an article." SPDoc 11, SR 127 (quoting *Lloyd*, *supra*, 637 F.2d at 1275). The context of the court's observation was in connection with the position taken by the Secretary of Labor with respect to delineation of the appropriate subdivision. Labor neglects to point out to the Court that the Ninth Circuit as well as the D.C. Circuit in *International Union, United Auto Workers etc. v. Marshall*, 584 F.2d 390, 394 & n. 15 & 395 (D.C. Cir. 1978) rejected the Secretary's interpretation "that an appropriate subdivision can never be larger than a plant" as *too restrictive*. *See* 637 F.2d at 1275 ("[t]he mechanical adoption of the plant as the appropriate subdivision without reasoned analysis is improper. *The circumstances of each case must be examined to determine the appropriate subdivision [to] that case*") (emphasis added). While cases such as *Lloyd* and *Pemberton* preceded the Supreme Court's guidance on deference to agency interpretations of law, *see United States v. Mead*, 533 U.S. 218 (2001); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), they are no less the law of the land, and the Supreme Court's decisions did not free up administrative agencies to revisit established judicial decisions on regulatory interpretation that an affected agency happens to continue to disagree with.

certification). Labor has only considered the issue of control in the context of the service worker analysis, the authority for which, as mentioned, is the TAA statute, which requires that jobs lost must have been dependant upon production. However, under either a "production" or "service" worker analysis, an interpretation that restricts "control" only to corporate control or ownership conflicts with the statutory purpose of relieving affected firms, whether related or not, along the line of production of an import-impacted article. *See*, *e.g.*, TA-W-40,910 (Apr. 29, 2002), *supra*; TA-W-39743, A, B, C & D (Jan. 3, 2002), *supra*.

An agency's permissible interpretation of its own regulations may be deserving of substantial deference so long as it is reasonable and does not conflict with law and legislative purpose. *See*, *e.g.*, *Mullins Coal Co. v. Director, OWCP*, 484 U.S. 135, 159, 108 S.Ct. 427, 440 (1987); *Former Employees of Bass Enterprises Production Co. v. United States*, 12 CIT 470, 473, 688 F.Supp. 625, 628 (1988). Labor asserts that "[t]he third type of 'appropriate subdivision' encompasses 'auxiliary facilities operated in conjunction with (whether or not physically separate from) production facilities.' This broadens the term "appropriate subdivision" to include a facility that does not produce an article." SPDoc 11, SR 127. Since the argument concedes that the analysis "broadens the term 'appropriate subdivision' to include a facility *that does not produce an article*[,]" it cannot be said that "service" workers are "engaged in production or transformation of a thing into something new and different." If Labor considers an "appropriate subdivision" certifiable under its "service worker" analysis despite the fact that such subdivision is not engaged in the production of something "new and different," then (as mentioned in Slip Op. 03-21) Labor's service worker analysis is an

*ultra vires* interpretation of its mandate. Hence, certification of the workers at such a subdivision would be lawful only by virtue of their *relationship* to production.

While Labor's "expansive" interpretation of the TAA statute to incorporate the so-called service-worker analysis is laudable, the Court holds that Labor's interpretation of the word "control" in that analysis is not "sufficiently reasonable" since it conflicts with the remedial purpose of the statute and economic reality. *Cf. American Lamb*, 785 F.2d 994, 1001 (1986) ("Though a court may reject an agency interpretation that contravenes clearly discernible legislative intent, its role when that intent is not contravened is to determine whether the agency's interpretation is 'sufficiently reasonable.'"). Interpreting "control" in the manner suggested would tend to include a "class" of workers the TAA statute was not intended to cover, and exclude a "class" of workers that it was intended to cover. The Court determines that it need not remand to Labor for further elaboration of why the plaintiffs are not entitled to benefits on the basis of a "production" analysis, because it is clear that substantial evidence does not support denial of certification under either a production or service worker analysis.

III

Substantial evidence supports a determination that the plaintiffs either produced an article within the meaning of Section 222 of the Trade Act or they are eligible for trade adjustment assistance benefits under application of Labor's "service worker" analysis. Only the third prong of 19 U.S.C. § 2272(a) is at issue, which requires certification when "increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and

to such decline in sales or production." The plaintiffs argued, and previously the Court accepted, that the key to TAA eligibility was the relationship of their subdivision to production at LTV, not the relationship of LTV to PLS. Remand was appropriate for adequate reconsideration of the issue.

A.

In support of the redetermination that the plaintiffs did not produce an article within the meaning of the TAA statute, the page from the supplemental record that Labor cites to support its "thorough investigation" actually[9] reads:

> Specifically, the PLS subdivision on location in Ohio at LTV worked closely with LTV production personnel to produce raw materials needed for the different types and grades of steel produced by LTV. LTV would not have been able to produce steel without the tasks performed by the PLS employees. Thus, the work performed by the employees in the PLS subdivision on location at LTV was integral to the production of steel.

Letter of March 25, 2003, SCDoc 3, SR 39. This letter, from a PLS representative, essentially reiterates in further detail what had previously been represented to Labor early on in record developed from the petition[10] (see Slip Op. 03-21). Other statements in the supplemental administrative record buttress the plaintiffs' position that they "produced" an article since they were an integral part of the LTV steel production line:

> * The former employees who worked in the PLS subdivision on location in Ohio were laid off when LTV ceased steel production. Their jobs were

_____

[9] Labor's out-of-context quotations in this matter concern the Court, and fall far short of the standards the Court expects of those charged with fact finding, coming so soon, as they do, after *Precision Specialty Metals, Inc. v. United States*, *aff'd* 315 F.3d 1346 (2003). The Court reserves jurisdiction for consideration of any further proceedings that may be appropriate.

[10] The initial administrative record, which Labor also cites, reads: "Our employees were engaged in employment related to the production of a product. The product was steel, specifically carbon flat-rolled steel." CDoc 13.

> dedicated to performing the operational tasks directed by LTV, and as such their employment was wholly dependent on steel production by LTV.
>
> \* Thus, employment at this subdivision was dependent on LTV's production of steel.
>
> \* [T]he work performed by the PLS subdivision on location at Independence, Ohio was integral to the production of steel.

Letter of March 20, 2003, SPDoc 3, SR 36-37, 39-40.

These statements are unrebutted by other evidence. Also unrebutted are the assertions that LTV controlled and directed the operations of the PLS subdivision and its employees on location in Ohio, *see* Weinzetl Decl., ¶¶ 7, 9, SPDoc 1, SR 13; Dunn Decl. ¶¶ 4-8, SPDoc 1, SR 17; Letter of March 20, 2003, SPDoc 3, SR 35, that the PLS subdivision was integrated into the LTV corporate structure with PLS employees reporting "directly to LTV on all operational matters," Dunn Decl. ¶ 6, SPDoc 1, SR 17, and that LTV directed which employees could work at specific locations, evaluated the job performance of the PLS employees, and advised PLS which PLS employees should receive merit salary increases, *see id.* ¶ 5, and that the PLS subdivision reported to LTV with respect to all assigned logistical tasks, *see id.* ¶ 6. Labor's analyses does not address the plaintiffs' assertions, and therefore Labor's investigation cannot be said to have been conducted with the utmost regard for affected workers. Since there appear no contrary indicia in the record, the Court finds these statements to constitute substantial evidence in support of an affirmative determination.

Similarly, Labor fails to address the record evidence that transportation management and logistic functions are a "key business process" in the production of steel, even when performed by outsourced employees who work with "commercial and operations groups." *See* Pl.s' Letter of March 17, 2003, SPDoc 1, SR 7-8 (offering for Labor's consideration S. Robertson, *Wheeling-Pitt*

*Outsourcing Cuts Logistics Costs*, 110 Am. Metal Mkt. 4 (Oct. 4, 2002)). *Cf.* Slip Op. 03-21 at 21

& Order of February 28, 2003 (permitting supplementation of administrative record with such

matter). The Court accepts that industry participants recognize that transportation management and

logistics are an essential or "key" aspect of the steel production process. Since all LTV employees

at the facilities in Cleveland and Independence already received TAA eligibility certification, *see* 66

Fed. Reg. 18117 (Apr. 5, 2001); 67 Fed. Reg. 15224 (Mar. 29, 2003); *see also* Investigative Report,

CR 16, and since the record demonstrates that the same facility in which the plaintiffs worked

"embodied" work qualifying as production, there appears to be no reason why the plaintiffs should

not have been similarly certified, particularly since their work may be said to have been more

"directly related" to production than that of administrative, clerical, security, and other such

"tangential" jobs at the LTV Technology Center.

B.

After restating the three-prong legal standard for the service worker test, Labor summarily

concludes that the first prong ("the workers' separation were [*sic*] caused importantly by a reduced

demand for their services from a parent firm, a firm otherwise related to the subject firm by

ownership, or a firm related by control") was not satisfied in this instance because PLS and LTV

were "not controlled or substantially or beneficially owned by the same persons." SPDoc 11, SR 130:

> The investigation indicates that substantially the same persons do not control PLS and LTV. Supplemental Administrative Record (SAR) 43. No corporate official of one company is a board member or officer of the other (or of Quadrivius). SAR 42. Substantially the same persons do not own PLS and LTV. LTV was a publicly owned company. SAR 39. After LTV's bankruptcy, PLS continued business. AR 25. The contract between LTV and PLS indicates that they are separate corporations. SAR 108.

*Id.*, SR 128.

Although Labor addresses the issue of control only in the context of the service worker analysis, it should be apparent from the foregoing that the issue of "control" also has important ramifications for the proper delineation of impacted-article production line. In the Court's earlier decision, after review of the evidence of record, it was clear that "[t]he only evidence of record indicates that [the plaintiffs] were engaged in work for LTV." Slip Op. 03-21 at 19. After supplementation of the administrative record with the declarations of Messrs. Dunn and Weinzetl and information obtained from PLS headquarters in Rochester, there was only greater evidence that the plaintiffs worked for (*i.e.*, were controlled by) LTV. And as discussed above, none of this evidence is addressed or disputed by Labor.

LTV clearly exercised the requisite control over the PLS subdivision on site in Ohio to satisfy the service worker test. The agreement between LTV and PLS clearly indicates a principle-agent relationship between PLS and LTV (and, obviously by extension, between LTV and the affected PLS subdivision), including liability for the actions of PLS employees  The agreement further obligated PLS to "expand its resources and hire personnel as may be necessary to give full attention to the services required by this Agreement." Except for the fact that the plaintiffs worked at the Independence Technology Center, there appears to be little distinction from the long term contract involved  between Stein Steel Mill Services, Inc and LTV Steel (at its Cleveland facility) in TA-W-40,910 (Apr. 29, 2002).

It is further undisputed that LTV actually managed all job tasks, directed which employees could work at specific locations, relocated the PLS subdivision between LTV facilities in Cleveland and Independence, evaluated the plaintiffs' job performances, and advised which PLS employees

were to receive merit salary increases. *See* Dunn Decl. at ¶¶ 5-6, SPDoc 1, SR 17; Letter of March 20, 2003, SPDoc 3, SR 36-37; Letter of March 25, 2003, SPDoc 4, SR 39-40. The "operational responsibilities of the employees in the PLS subdivision that worked on location in Ohio at LTV were established and controlled by LTV." Letter of March 20, 2003, SPDoc 1, SR 35-36. As a PLS subdivision, the plaintiffs were integrated into the LTV corporate structure. *See* Weinzetl Decl. at ¶¶ 7, 9, SPDoc 1, SR 13; Dunn Decl. at ¶¶ 4-8, SPDoc 1, SR 16-17. Moreover, the employees within the PLS subdivision were responsible to LTV for all assigned logistical tasks. *See* Dunn Decl. at ¶ 7, SPDoc 1, SR 17. Mr. Dunn, the CFO of PLS and the executive responsible for the LTV account, asserted to Labor that "the PLS employees working in [the PLS subdivision at the LTV facilities in Ohio] reported directly to LTV employees on all operational matters." *See* Dunn Decl. at ¶ 6, SPDoc 1, SR 17 (citing flow chart demonstrating the reporting structure of the PLS subdivision, attached as Exhibit 1 to the Dunn Declaration; *see* SR 19).

The plaintiffs argue that reversal is appropriate because Labor has once again failed to point to substantial evidence on the record showing that the plaintiffs did not produce an article and that they were not controlled by LTV. The Court agrees. Labor has now had five bites at the apple: (1) initial denial of eligibility, (2) denial of reconsideration for eligibility, (3) contest of the plaintiffs' claim when filed with this Court, (4) refusal to seek voluntary remand after consultations with *pro bono* counsel prior to briefing, and (5) reconsideration of the matter on remand. Labor now seeks a sixth bite, and it is apparent that there is little apple left. The Court therefore relieves Labor of the core, reverses Labor's negative eligibility determination and awards judgment to the plaintiffs ordering Labor to certify the plaintiffs as eligible for trade adjustment assistance benefits. *See* 19

U.S.C. § 2395(c) ("[The] Court of International Trade shall have jurisdiction to affirm the action of the Secretary of Labor . . . or to set such action aside, in whole or in part."); *United Elec. Radio and Mach. Workers fo America v. Martin*, 15 CIT 299, 309 (1991) (Labor ordered to certify plaintiffs). *Cf. Former Employees of Hawkins Oil And Gas, Inc. v. United States Sec'y of Labor*, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993) (court-ordered certification of plaintiffs).

### *Conclusion*

For the foregoing reasons, Labor's negative eligibility determination is reversed, and judgment is awarded to the plaintiffs. Labor shall certify the plaintiffs as eligible for trade adjustment assistance benefits forthwith.

_____
R. KENTON MUSGRAVE, JUDGE

Dated: August 28, 2003
          New York, New York